HELENA O'DONNELL, administratrix, *vs.* JORDAN MARSH .COMPANY.

Suffolk.   December 11, 1913. — January 8, 1914.

Present: RUGG, C. J., HAMMOND, LORING, BRALEY, & DE COURCY, JJ.

*Negligence,* Employer's liability.   *Elevator.*

Circumstances may be shown which warrant a jury in finding that it was the duty of the proprietor of a six story building maintaining therein a freight elevator with an open platform, on which, besides goods, employees of the proprietor of the building were expected to be transported in the course of their duties, to anticipate and guard against possible injuries to such persons by reason of some portion of their bodies or clothing extending as much as six and three quarters inches beyond the line of the edge of the platform.

If a receiving clerk in a department store, in going from the fifth floor of his employer's building to the receiving door on the sidewalk, is being transported on the open platform of a freight elevator, on which also are other employees and two loaded trucks, and, as the elevator is descending, the receiving clerk leans forward to answer an inquiry of a fellow employee and in doing so brings a. portion of his body somewhat outside the line of the platform and the seat of his trousers is caught by an iron hook which projects from the brick wall of

the elevator well to within six and three quarters inches of the line of the platform, the hook having been there for a long time in a place so dark that it only would be seen by looking for it, and if as the elevator descends he is left hanging from the hook and, his trousers giving way, he falls down the elevator well and is killed, the owner of the building maintaining the elevator can be found to be liable for causing his death.

TORT by the administratrix of the estate of John O'Donnell, who was employed as a receiving clerk by the defendant, a corporation conducting a department store in a building belonging to it in Boston, for the conscious suffering and death of the plaintiff's intestate caused by his falling down the well of a freight elevator in the defendant's building under the circumstances described in the opinion. Writ dated May 27, 1910.

In the Superior Court the case was tried before *Fessenden, J.,* who at the close of the evidence, which is described in the opinion, ordered a verdict for the defendant, and at the request of both parties reported the case for determination by this court, with a stipulation that, if the case should have been submitted to the jury, judgment should be entered for the plaintiff in the sum of $3,000.

*C. W. Bond,* (*P. J. Duane* with him,) for the plaintiff.

*J. Lowell,* (*J. A. Lowell* with him,) for the defendant.

LORING, J. This is an action for negligently causing the death of the plaintiff's intestate while he was riding in the course of his employment on a freight elevator in his employer's building. The elevator in question ran in a well with one opening on the sidewalk of Avon Street, and with six openings on the other side of the well, one for each of the six floors of the building. Ordinarily it was used to carry goods from the sidewalk, where they were received by the defendant company, up to the stock rooms on the fifth and sixth floors. But when for any reason it was necessary, the elevator was used also to carry goods from the stock rooms on these two floors down to the sales department on the first, second, third and fourth floors. The deceased was the defendant's receiving clerk, and on the day he was killed had gone on to the elevator at the fifth floor to go to his post of duty at the receiving door on the Avon Street sidewalk. After he had gone on to the elevator two trucks, loaded with Turkish towels from the stock room on that floor which were to be carried to the sales department on the third floor, were wheeled on to the car. Then an

assistant engineer, Duncan by name, and the elevator operator, Moore by name, also boarded the elevator. The elevator boy, the engineer and the two men in charge of the trucks stood in front of the trucks and between them and the store side of the well. The deceased stood on the street side of the trucks, facing the store. The elevator began to go down in the ordinary way. Between the fourth and third floors the trousers of the deceased were caught on an iron hook in the brick wall of the building which constituted the street side of the elevator well, and as the car went down he was left hanging by the hook. He cried out to the operator and the operator stopped the car. The car stopped opposite a window which was recessed quite deeply in the outside wall of the building. As the car stopped, or just after it stopped, the deceased's trousers gave way, he fell through the recess of the window around the car to the bottom of the well, and, after conscious suffering, died.

The hook was the prong of one of a number of angle irons inserted in the original construction of the outer wall of the building to hold the wall together at a point where the outer wall became two inches narrower in thickness than it was below the point in question. Several of these hooks were inserted with the prong down and the others, including the hook in question, with the prong up. The prongs were (or could have been found by the jury to be) about three inches high. In the original construction of the wall, the space back of the prong was filled in with brick so that there was a ledge of brick at the point where the outer wall became two inches narrower. But at some time before the accident here in question, the brick back of this prong had been broken off, leaving the prong sticking up three inches in height, with nothing behind it to fill in the intervening space. It was in this way that the hook was made on which the deceased was caught by the seat of his trousers.

As we understand the report the elevator consisted of a platform open on all sides, and the clearance between the platform and the side of the well was six and three quarters inches below the point where the wall became thinner and eight and three quarters inches above that point. "The length of the platform [of the elevator car] looking from the street into the store or from the store to the street, was six feet six inches, and the width was

five feet, five and one half inches inside the channel irons, but five feet, seven inches inside the grille work." The trucks in question were four feet long, two feet wide and three and one half to four feet high. The evidence showed that the Turkish towels were piled up on them about a foot higher.

From the appearance of the prong and of the broken bricks back of the prong, the jury were warranted in finding that the dangerous condition here complained of was of long standing. They were also warranted in finding that the existence of the hook was not an obvious danger. The elevator well generally was not light, and at this point "was pretty dark, pretty hard to see." More than that, no one of the many witnesses produced by the plaintiff or by the defendant ever had seen the prong or hook in question, or its fellows, until they looked for the cause of the accident to the deceased.

When the elevator started down on the trip in question, the deceased was standing (or could have been found by the jury to have been standing) upright and close up to the truck behind which he had placed himself. After the elevator had started, the stock clerk on the fifth floor, one Gaudet by name, called to the deceased to ask him where certain goods were which he (Gaudet) could not find. On being called to by Gaudet, the deceased bent forward toward him, but before he could answer the accident happened and was over in a few seconds.

The plaintiff's case comes to this: Before the elevator started there was a space of about one foot and three inches between the ends of the trucks and the ends of the car, and there was a clearance between the car and the outer wall of eight and three quarters inches. When in descending the elevator reached a point between the fourth and third floors, this clearance space was narrowed by a two inch ledge of brick on the top of which was this iron prong, standing up some three inches. At this point the elevator well was pretty dark and no one had seen this prong, although it could be easily seen if a person looked for it. The deceased, who had been standing close to the end of the truck in front of him, leaned forward when spoken to by Gaudet, and as he leaned forward in response to the call from Gaudet he thrust part of his body outside the side line of the platform of the elevator and was caught on the hook.

No serious question has been made on the due care of the deceased.

As to its negligence the defendant relies on *McDonald* v. *Dutton,* 198 Mass. 398. In that case it was said by this court at page 400: "The defendants had a right to assume under these circumstances that their servants riding upon this elevator would not allow their feet to go beyond the limits of the platform, and were not bound to anticipate or guard against such possible injuries as otherwise might be caused."

This statement in *McDonald* v. *Dutton* cannot be taken to have been a statement that the owner of an open freight elevator is under no circumstances bound to anticipate or guard against possible injuries arising from persons using the elevator allowing some part of their body to go beyond the limits of its platform. The contrary was held in the case of a passenger elevator in the recent case of *Munsey* v. *Webb,* 231 U. S. 150. In that case the plaintiff, while riding in a passenger elevator, fell and his head was caught by a threshold which protruded some three inches into the elevator well; the threshold was not bevelled up from below so as to push a person back who should fall under it, and the elevator boy did not have the door of the elevator shut or his arm across the open space, as he had been instructed to do when the elevator door was rolled back. In delivering the opinion of the court in that case Holmes, J., said at page 155, "But the possibility and the danger that in some way one in the car should get some part of his person outside the car while it was in motion was obvious and was shown to have been anticipated by the door being there. In some circumstances at least it was a danger that ought to be and was guarded against." The "circumstances" referred to by this court in *McDonald* v. *Dutton, ubi supra,* were set forth more at length when that case was first before this court. (See *McDonald* v. *Dutton,* 190 Mass. 391.) In *McDonald* v. *Dutton* the elevator well was a short one starting in the basement and going to the sidewalk, and when the sidewalk cover was off, the well was perfectly light throughout. The sides of the well were plastered. The clearance between the elevator car and the sides of the well was about one inch, and there was some vibration in the working of the elevator, especially in case of heavy loads. Shallow holes, such as the one complained of (which was

from three quarters of an inch to one and one half inches), were bound to be caused by the ordinary use of such an elevator in such a well. And what is of peculiar importance, the fact that the walls of that elevator well were of plaster was one of the dangers assumed by the plaintiff when he chose to enter the defendant's employ. It is manifest that the "circumstances" under which the accident happened in the case at bar and those which existed in *McDonald* v. *Dutton* are different. The rule laid down under the "circumstances" of that case should not be extended to the circumstances which obtained in the case at bar.

A majority of the court are of opinion that under the circumstances of the case at bar the jury were warranted in finding that the possibility and the danger that in some way a person in the car might get some part of his body outside the car while it was in motion ought to have been anticipated by the defendant; and also were warranted in finding that it was negligent to have left this hook which was within six and three quarters inches of the side of the car. To realize what the clearance space of six and three quarters inches means, it is enough to say that the length of a page in the Massachusetts Reports is just over nine inches.

In accordance with the terms of the report judgment must be entered for the plaintiff in the sum of $3,000; and it is

*So ordered.*